**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                          No. CR 06-2364  JB

PORTIA ENLOW,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Defendant's Motion for Downward Departure and Request for Evidentiary Hearing, filed April 27, 2007 (Doc. 26)("Motion").  The Court held an evidentiary/sentencing hearing on August 10, 2007.  The primary issue is whether the Court should, pursuant to U.S.S.G. § 5K2.12, grant Defendant Portia Enlow's request for a downward departure, because she committed the offense of which she was convicted under coercion or duress.  Because the Court concludes that the record before it does not demonstrate sufficient coercion or duress to warrant a downward departure, the Court will not depart downward under the Guidelines.

**FACTUAL BACKGROUND**

Enlow was arrested at the Amtrak Station in Albuquerque, New Mexico on October17, 2006. See Pre-Sentence Investigation Report at 1, disclosed March 26, 2007 ("PSR"); id. ¶ 8, at 4.  On that day, Drug Enforcement Administration ("DEA") agents from the Albuquerque field office reviewed an Amtrak Train Passenger Name Record that indicated that Enlow was traveling on a one-way ticket from Los Angeles, California to Baltimore, Maryland/Washington, D.C.  See id. ¶ 7, at 4.

When the train arrived in Albuquerque, the agents boarded the coach car to which Enlow was assigned and began conducting consensual encounters with several passengers.  See id. ¶ 8, at 4. One of the agents asked Enlow if she had any luggage on the train and she identified a bag on the floor as her only piece of luggage.  See id.  After the agents had spoken with most of the other passengers on the train, they noticed a suitcase that none of the passengers had claimed.  See id. ¶ 9, at 4-5.  The suitcase was located in an overhead storage compartment above Enlow's assigned seat.  See id.  When questioned about the suitcase, Enlow stated that it belonged to her.  See id.  She also gave her consent to the agents to search the suitcase.  See id.  Inside the suitcase, the agents found a white powdery substance that field tested positive for cocaine.  See id.  The agents also found marijuana, delta-9-tetrahydrocannabinol ("THC"), and diazepam.  See id. ¶ 10, at 5.  The agents arrested Enlow and transported her to the Albuquerque field office.  See id. ¶ 9, at 4-5.

Following her arrest, Enlow told agents: (i) that she had borrowed approximately $3,500.00 from her friend, Jack Kendall, whom she had known for four years; (ii) that he had told her that he would erase her debt to him if she transported cocaine from Los Angeles to Washington, D.C.; and (iii) that she had wanted to repay Kendall instead of transporting cocaine, but his threats against her and her parents led her to agree to transport the cocaine.  See id. ¶ 11, at 5.  Enlow later told a United States Probation Officer that she borrowed the money from Kendall because she had fallen behind on her rent.  See id. ¶ 17, at 6.  Enlow stated that she has always been irresponsible with money and that she had purchased clothing and shoes instead of paying her rent.  See id.  Enlow also stated that she did not attempt to borrow money from her parents, because she did not want them to be disappointed in her for not being more responsible with her money.  See id.  Enlow represents that she only agreed to transport the cocaine because of Kendall's threats of physical harm and property damage against her and her family.  See Motion at 1-2, 8.

## PROCEDURAL BACKGROUND

Enlow entered into a plea agreement with the United States in February 2007. Thereafter, she filed a motion requesting that the Court depart downward under the Guidelines and hold an evidentiary hearing. The Court held a hearing at which Enlow, her mother, Mary Clark, DEA Special Agent David Smith, and United States Probation Officer Andrew Self testified.

### 1.      Plea Agreement.

On November 15, 2006, a federal grand jury returned an Indictment charging Enlow with unlawfully, knowingly, and intentionally possessing with intent to distribute 500 grams and more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). See Indictment, filed November 15, 2006 (Doc. 9). Enlow waived her right to appear at her arraignment and entered a plea of not guilty on November 22, 2006. See Waiver of Appearance at Arraignment and Entry of Plea, November 22, 2006 (Doc. 14). On February 1, 2007, Enlow entered into a Plea Agreement with the United States in which she pled guilty to the offense charged in the Indictment. See Plea Agreement, filed February 1, 2007 (Doc. 24).

### 2.      Motion for Downward Departure.

Enlow filed her downward departure motion and request for an evidentiary hearing on April 27, 2007. See Doc. 26. In her motion, Enlow asserts that she transported the contraband because Kendall threatened and intimidated her. See Motion at 1. Specifically, Enlow maintains that Kendall explicitly threatened her and her family with physical harm and property damage, and that she and her family were objectively afraid of Kendall. See id. at 1-2, 8. Enlow states that, "[w]hile there was an underlying economic thread running through [her actions], . . . the actual fear of harm and concern for her family . . . was the ultimate motivation for [her] to commit this crime." Id. at 8. Enlow contends that she committed the offense because of Kendall's threats and actions, that she

thus committed the offense under coercion or duress, and that she is therefore entitled to a downward departure under § 5K2.12.  See id. at 8-9.  Enlow requests that the Court hold an evidentiary hearing so that she and Clark can testify regarding Kendall's threats and actions.  See id.  Enlow acknowledges that she bears the burden of showing, by a preponderance of the evidence, that she is eligible for the downward departure she seeks.  See id. at 4.

### 3.      Evidentiary Hearing.

At the hearing, with respect to Kendall's threats and actions, Enlow testified that Kendall called her on the phone at home and at work several times, telling her that "[she] better get the money or else," and that he would "F [her] up," "F [her] parents up," and "F up [her parent's] house" unless she repaid him the money he had leant her.  Transcript of Hearing at 18:1-6; 18:11-12; 18:17-18 (Enlow)(taken August 10, 2007)("Transcript").[1]  Enlow testified that Kendall visited her place of employment and threatened her on October 3, 2007.  See id. at 16:11-18.  Enlow testified that he returned to her place of employment on October 5, 2007 "looking real crazy in the face" and told her that "[she was] going to California[, that] [he was] going to get a plane ticket and . . . meet [her] there[,] and [that,] once [he] me[t] her there[,] [she] was going to bring something back for [him]."  Id. at 20:10-13.  Enlow testified that Kendall told her that "[there is] no doubt that you're not going to do it because you are," that "[y]ou don't have a choice," and that "if you don't do it, then it's either you do it or it's your parents."  Id. at 20:13-15.  Enlow testified that she did not call the police regarding Kendall's threats because "[she] was scared," and that she did not tell her parents about the situation because "[she] didn't want to hurt [her] mom and embarrass her."  Id. at 21:19-23.

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Enlow testified further that, on October 5, 2007, she and Kendall went to a travel agency, and he bought her a ticket to Los Angeles.  See id. at 22:20-23:3.  Enlow testified that, before they purchased the plane ticket, she requested and received time off of work from her boss.  See id. at 23:13-17.  Enlow testified that Kendall told her that, when she brought back what he wanted to be transported from Los Angeles, "[her] debt would be erased."  Id. at 25:5-7.  Enlow testified that she flew to Los Angeles on October 14, 2007.  See id. at 25:13-15.  She testified that Kendall picked her up from the airport and that they then purchased a train ticket for her return to the east coast.  See id. at 42:7-10.  Enlow testified that she spent two days in Los Angeles before boarding the train to Baltimore/Washington, D.C., that she did not socialize with Kendall during that time, and that, rather than "hang out" by herself, she contacted friends of hers in Los Angeles.  See id. at 42:13-19.  Enlow testified that she did not call the police when Kendall threatened her in Pennsylvania, that she did not call the police when she was in California, and that she did not attempt to inform the train conductor or call the police once she was "pretty sure" she was transporting cocaine back to the east coast.  See id. at 42:20-43:11.

Enlow testified that, when the DEA agents approached her on the train and asked her if her suitcase contained any drugs, she lied and said no.  See id. at 32:23-33:3.  Enlow testified that, when the agents asked her about a package contained within the suitcase, she lied and said that it contained "rocks for [her] mother."  Id. at 33:8-12.

Enlow testified that she does not do drugs, but that she did smoke marijuana in California with Kendall because she was nervous.  See id. at 22:15-17.  Enlow testified that she never smoked marijuana before that day.  See id. at 18-19.  Enlow also testified that, while she does not have a prescription for Valium, she takes it "from time to time to help [her] sleep."  Id. at 39:8-17.

Clark also testified at the hearing regarding Kendall's threats.  Clark testified that, in October

2007, she received phone calls at the family's church from a man asking for Enlow.  See id. at

51:15-16 (Clark).  She testified that the calls "became more intense" and that "[t]hey were very very

disturbing using foul language."  Id. at 51:17-18.  Clark testified that the man making the disturbing

phone calls threatened to "F [the church] up" and "blow up [her] house."  Id. at 52:17-19; 53:1-3.

Clark testified that, around the same time that she was receiving the threatening phone calls, some

large windows at the church were vandalized.  See id. at 55:8-12.  Clark testified that the first time

she had heard Enlow was being threatened was when Self called her.  See id. at 61:17-20.

At the hearing, Smith testified regarding the approximate amount and value of the cocaine

that was found in Enlow's possession on the train.   Smith testified that Enlow possessed

approximately one and a half gross kilograms of cocaine.  See id. at 67:8-11 (Smith).  Smith testified

that, in Albuquerque, that amount of cocaine would be worth approximately $24,000.00.  See id. at

68:11-17.

Self testified at the hearing regarding Enlow's self-reported drug use.  Self testified that he

was "quite certain" that he asked Enlow "how long she had used drugs and what kind."  Id. at 86:25-

87:3 (Self).  Self testified that, in response to that question, Enlow told him that she had used

marijuana since she was a teenager and that she used it, on average, twice a week.  See id. at 86:17-

24.

## U.S.S.G. § 5K2.12

U.S.S.G. § 5K2.12 provides:

If the defendant committed the offense because of serious coercion, blackmail or
duress, under circumstances not amounting to a complete defense, the court may
depart downward. The extent of the decrease ordinarily should depend on the
reasonableness of the defendant's actions, on the proportionality of the defendant's
actions to the seriousness of coercion, blackmail, or duress involved, and on the
extent to which the conduct would have been less harmful under the circumstances
as the defendant believed them to be. Ordinarily coercion will be sufficiently serious

to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency. Notwithstanding this policy statement, personal financial difficulties and economic pressures upon a trade or business do not warrant a downward departure.

U.S.S.G. § 5K2.12. It is impermissible for a court to depart based on financial or economic coercion or duress. See United States v. Contreras, 180 F.3d 1204, 1211 (10th Cir. 1999). Also, purely emotional coercion is insufficient to warrant a departure. See id. at 1211-12. "To justify a departure, the alleged coercion [or duress] must have caused the defendant to commit the criminal act." United States v. Gallegos, 129 F.3d 1140, 1145 (10th Cir. 1997). In determining whether to depart under § 5K2.12, a court may also consider whether the defendant had "a reasonable belief of a current and imminent threat." United States v. Burks, 490 F.3d 563, 566 (7th Cir. 2007).

## LAW REGARDING COERCION AND DURESS

A defendant is entitled to an instruction on the affirmative defense of coercion or duress if he or she can demonstrate the following:

[i] that defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury;

[ii] that defendant had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct;

[iii] that defendant had no reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm; and

[iv] that a direct causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm.

United States v. Butler, 485 F.3d 569, 572 (10th Cir. 2007)(quoting United States v. Vigil, 743 F.2d 751, 755 (10th Cir. 1984))(internal quotations and alterations omitted). If all four factors are established, "the defense is available only so long as all of those factors continue to exist." United

States v. Butler, 485 F.3d at 572.  To satisfy the first element of a coercion or duress defense, the

defendant must show that the imminent danger persisted "throughout the possession."  Id. at 573.

To satisfy the third element of a coercion or duress defense, the defendant must demonstrate that he

or she had "no reasonable, legal alternatives to possess[ion]. . . ."  Id. at 576.

**LAW REGARDING DEPARTURE UNDER THE SENTENCING GUIDELINES**

The Supreme Court of the United States' holding in United States v. Booker, 543 U.S. 220

(2005), "requires a sentencing court to consider Guideline ranges, but it permits the court to tailor

the sentence in light of other statutory concerns as well."  Id. at 245-46.  Thus, before considering

the other factors in 18 U.S.C. § 3553(a), the sentencing court must first determine, as accurately as

possible, what the Guidelines' sentence would be.  See United States v. Kristl, 437 F.3d 1050, 1055

(10th Cir. 2006).  Only then can the sentencing court make an informed decision whether to vary

from the Guideline sentence.  See id.  "Each guideline attempts to anticipate a broad range of typical

cases -- a 'heartland' -- that is representative of the circumstances and consequences of ordinary

crimes of the type to which the guideline applies."  Id.

> U.S.S.G. § 5K2.0 contains the court's authority to depart from the Guidelines and states:
>
> (1) In General.-- The sentencing court may depart from the applicable guideline range if --
>
>> (A) in the case of offenses other than child crimes and sexual offenses, the court finds, pursuant to 18 U.S.C. 3553(b)(1), that there exists an aggravating or mitigating circumstance; or
>>
>> (B) in the case of child crimes and sexual offenses, the court finds, pursuant to 18 U.S.C. 3553(b)(2)(A)(i), that there exists an aggravating circumstance, of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. 3553(a)(2), should result in a sentence different from that described.

U.S.S.G. § 5K2.0(a)(1).  To determine and assess, for purposes of determining a Guidelines'

-8-

sentence, whether the Sentencing Commission adequately took a circumstance into consideration, Congress has limited the court's inquiry and instructed courts to "consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." 18 U.S.C. 3553(b)(1). See United States v. Jones, 158 F.3d at 497. The Guidelines instruct courts that the Sentencing Commission did not adequately take into account cases that are, for one reason or another, "unusual." U.S.S.G. § 1A1.1, intro. cmt. 4(b).

> The Introduction to the Guidelines explains:
>
> The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

Id. The Sentencing Commission lists certain factors that can never serve as the basis for a departure: (i) race, sex, national origin, creed, religion, socio-economic status, see U.S.S.G. § 5H1.10; (ii) lack of guidance as a youth, see id. § 5H1.12; (iii) drug or alcohol dependence, see id. § 5H1.4; and (iv) economic hardship, see id. § 5K2.12. With the exception of those listed factors, however, the Sentencing Commission did "not intend to limit the kinds of factors (whether or not mentioned anywhere else in the guidelines) that could constitute grounds for departure in an unusual case." U.S.S.G. § 1A1.1, intro. cmt. 4(b).

In Koon v. United States, 518 U.S. 81 (1996), the Supreme Court of the United States clarified federal district judges' sentencing role and the extent of their authority to depart under the Guidelines. See 518 U.S. at 113. The Supreme Court recognized that the Guidelines' goal is "to reduce unjustified disparities and to reach towards the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice." Id. The Supreme Court explained that "the Guidelines provide uniformity, predictability, and a degree of detachment lacking in our earlier

system." Id. It interpreted congressional intent as follows:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States district judge.

Id. A departure is warranted if the case is "unusual enough for it to fall outside the heartland of cases in the Guideline." Id. at 98. The Supreme Court in Koon v. United States alluded to the fact that then-Chief Judge of the United States Court of Appeals for the First Circuit and now Associate Justice, Stephen G. Breyer, in response to the Sentencing Commission's treatment of departure factors, explained that a sentencing court considering a departure should ask the following questions:

> 1) What features of this case, potentially, take it outside the Guidelines' "heartland" and make of it a special, or unusual, case?
>
> 2) Has the Commission forbidden departures based on those features?
>
> 3) If not, has the Commission encouraged departures based on those features?
>
> 4) If not, has the Commission discouraged departures based on those features?

Id. at 95 (quoting United States v. Rivera, 994 F.2d 942, 949 (1st Cir.1993))(internal quotations omitted). In addressing these questions and further explaining the analysis that a district court should undertake in determining whether a departure from the Guidelines is appropriate, the Supreme Court explained that the Sentencing Commission prohibits consideration of a few factors, and it provides guidance as to the factors that are likely to make a case atypical by delineating certain of them as "encouraged" bases for departure and others as "discouraged" bases for departure. See Koon v. United States, 518 U.S. at 96.

Courts may depart on the basis of an encouraged factor if the applicable Guideline does not already take the factor into account. See id. A court may depart on the basis of a discouraged

factor, or an encouraged factor already taken into account, "only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." Id. If the Guidelines do not mention a factor, the court must, after considering the structure and theory of relevant individual Guidelines and the Guidelines as a whole, decide whether the factor is sufficiently unusual to take the case out of the Guideline's heartland, bearing in mind the Sentencing Commission's expectation that departures based on factors not mentioned in the Guidelines will be "highly infrequent." Id. (internal quotations omitted).

## ANALYSIS

Preliminarily, the Court notes that it granted Enlow's request for an evidentiary hearing. The Court held the evidentiary hearing Enlow requested simultaneously with a hearing on her motion for downward departure and her sentencing hearing. The Court concludes that, at the evidentiary/sentencing hearing and in her written briefing, Enlow has failed to demonstrate that she is entitled to a departure under § 5K2.12. The Court will, therefore, not grant Enlow's request for a downward departure.

The Court will deny Enlow's request for a departure pursuant to § 5K2.12. The Court believes that Enlow has produced some evidence of coercion or duress, but the Court does not believe that she has produced evidence demonstrating a "serious" degree of coercion or duress as § 5K2.12 requires. U.S.S.G. § 5K2.12 ("If the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may depart downward."). While the Court acknowledges that Enlow does not have to demonstrate all of the elements of a coercion or duress defense to receive a departure under § 5K2.12, the Court believes that Enlow's imperfect coercion or duress defense is relatively weak. First, the Court does not believe that Enlow has shown that she was under an unlawful and present, imminent, or

-11-

impending threat.  According to Enlow, Kendall visited her place of employment on October 3, 2007

and October 5, 2007.  Enlow also asserts that Kendall called her on the telephone and threatened her

on and between those dates.  Enlow states that Kendall purchased her plane ticket to Los Angeles

on October 5, 2007, that she flew to Los Angeles on October 14, 2007, and that she did not see

Kendall in between those dates.  Enlow also represents that she did not socialize with Kendall during

her time in Los Angeles and that, instead, she socialized with friends of hers who live there.  Given

the extended periods in between Kendall's alleged contact with Enlow and its intermittent nature,

the Court does not believe that Enlow comes close to satisfying the first element of a coercion or

duress defense.  See United States v. Butler, 485 F.3d at 572-73 (stating that, to be entitled to an

instruction on an affirmative defense of coercion or duress, the defendant must show that he or she

was under an unlawful and present, imminent, or impending threat, and that the present, imminent,

or impending danger persisted throughout the possession).

Second, the Court does not believe that Enlow comes close to satisfying the third element

of a coercion or duress defense -- that she had no reasonable, legal alternatives to transporting the

cocaine.  See id. at 572, 576.  Enlow has not adequately explained to the Court why she did not

attempt to contact authorities when she was outside of Kendall's presence.  The Court believes that,

given the intermittent nature of Kendall's alleged contact with Enlow, she had several opportunities

to attempt to seek assistance from law-enforcement authorities.  See id. at 572 (stating that a

coercion or duress defense "is available only so long as all of th[e] factors continue to exist").

Finally, and based partly on Enlow's failure to satisfy the first and third elements of a coercion or

duress defense, the Court does not believe that Enlow has demonstrated a "direct causal

relationship" between her transporting cocaine and her avoiding the harms Kendall allegedly

threatened.  See United States v. Gallegos, 129 F.3d at 1145 ("To justify a departure, the alleged

coercion [or duress] must have caused the defendant to commit the criminal act."). Considering the foregoing, the Court finds that Enlow has not shown that she committed the offense of which she was convicted because of "serious" coercion or duress. U.S.S.G. § 5K2.12 ("If the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may depart downward.").

While the Court finds credible Enlow's and her mother's testimony about there being some coercion, Clark's testimony is very limited, and the Court would have to make a number of leaps to use it to support directly Enlow's more extensive testimony about threats of physical harm. While the Court believes that Kendall used threats of physical harm, the Court is not convinced that they were as prevalent or important in Enlow's decision as the economic ones. While the Court finds credible the evidence that there were threats of physical harm, and of the overall framework of her story, there are credibility problems with many details. Enlow admits to lying to the DEA agents and there is contradictory testimony about her drug use.

Enlow indicated that her mother had always helped her in the past with money problems. Her mother confirmed that she would have helped her daughter with the debt. The debt was about $3,500.00, and Enlow worked at good paying jobs. Her debt was manageable by means other than the transport of drugs for a former boyfriend. It remains unclear to the Court -- given the inconsistencies and problems with her story -- why Enlow did what she did.

In any case, the Court chooses not to depart, because it does not believe that a departure is warranted under the facts and circumstances that have been presented. Unfortunately, the Court sees many cases in which the defendants choose to become drug couriers, because they are dealing with pressures of some sort. The Court does not believe that the pressures Enlow was allegedly under are significantly different than those that many of the other drug-courier defendants it has seen face.

Indeed, given her ability to get money to pay her debt, the Court finds the economic pressure on many couriers along the border to help often sick family members to be as great as what Enlow experienced.  The Court has difficulty distinguishing Enlow's case from the others that have come before it and believes that it is within the heartland of the drug-trafficking cases it has seen.  Again, the Court notes that Enlow is far from satisfying that the harm Kendall allegedly threatened was imminent and that she had no reasonable, legal alternatives to transporting the cocaine.  The Court will deny Enlow's request for a downward departure.

IT IS ORDERED that the Defendant's Motion for Downward Departure and Request for Evidentiary Hearing is granted in part and denied in part.  The Court granted Enlow's request for an evidentiary hearing.  The Court denies Enlow's request for a downward departure.[2]

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Larry Gomez
  Acting United States Attorney
Reeve L. Swainston
  Assistant United States Attorney
Albuquerque, New Mexico

        *Attorneys for the Plaintiff*

David L. Plotsky
Plotsky & Dougherty, P.C.
Albuquerque, New Mexico

        *Attorney for the Defendant*

---

[2] Consistent with the Court's ruling at the hearing, see Transcript at 96:20-97:7 (Court), and for the reasons given at the time of the hearing, see id. at 94:20-96:21, the Court will not vary from the sentence that the Guidelines' recommend.  The Court has fully considered the factors set forth in 18 U.S.C. § 3553(a), and determined that a variance is not warranted pursuant to the Court's authority under United States v. Booker.